UNITED STATES of America

v.

David L. WHETZEL, Appellant.

No. 78–1468.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 12, 1978.

Decided Nov. 27, 1978.

53. *Report and Order, supra* note 7, at 7–8; J. A. at 591–92.

Bruce D. Jones, Jr., Washington, D. C. (appointed by this court) for appellant.

Richard W. Hausler, Asst. U. S. Atty., Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell, Stephen R. Spivack, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before BAZELON, McGOWAN and ROBINSON, Circuit Judges.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The appeal is from a judgment, rendered following a jury trial, convicting appellant Whetzel on 33 counts of copyright infringement in contravention of 17 U.S.C. §§ 1(f) and 104(b),[1] and two counts of transporting property "stolen, converted or taken by fraud" across a state line in violation of 18 U.S.C. § 2314.[2] We are asked, on varying grounds, to set the convictions aside in toto. We find the evidence legally insufficient to establish an essential element of the transportation offenses charged, and on these we accordingly reverse. We perceive no basis

for disturbing the outcome on the copyright infringement counts, so on these we affirm.

### I

The material facts are few and undisputed. On June 30, 1977, Whetzel drove his van across the District of Columbia line into Maryland, pulled into the parking lot of a fast-food restaurant and sold 1,040 eight-track tapes of popular sound recordings[3] to a special agent of the Federal Bureau of Investigation for $1,040. A month later, on July 31, Whetzel substantially repeated these actions, this time peddling 1,767 tapes to the agent for $1,767. Both transactions were videotaped, and subsequently Whetzel was indicted and tried.[4] The jury returned a verdict of guilty, and the District Court sentenced Whetzel to concurrent one-year terms of incarceration on each of the copyright infringement counts,[5] and to terms of two to six years on the transportation counts, those sentences to be served concurrently with each other and with those on the copyright counts.

Whetzel attacks the legal efficacy of the evidence to establish a value for the transported property meeting the minimum amount fixed by the statute defining the

---

1. 17 U.S.C. § 1(f) (1976) in pertinent part provides that

   [a]ny person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right: (f) To reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording . . .

   And 17 U.S.C. § 104(b) reads:

   Any person who willfully and for profit shall infringe any copyright provided by section 1(f) of this title, or who should knowingly and willfully aid or abet such infringement, shall be fined not more than $25,000 or imprisoned not more than one year, or both, for the first offense and shall be fined not more than $50,000 .or imprisoned not more than two years, or both, for any subsequent offense.

   These provisions were amended and recodified as part of the general congressional revision of the copyright laws effective January 1, 1978. See 17 U.S.C.A. §§ 106, 506(a) (1977). The changes have no bearing upon this litigation since the activities charged as criminally offensive antedated their operation.

2. In relevant part, 18 U.S.C. § 2314 (1976) provides that

   [w]hoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

3. We use the term "sound recording" to denote the aggregation of sounds subject to a copyright, as distinguished from the tangible medium through which the sounds can be reproduced.

4. An indictment returned December 13, 1977, charged Whetzel in two counts with interstate transportation of stolen property and in 35 counts with copyright infringement. A superseding indictment was filed on February 28, 1978, charging two transportation and 34 copyright violations. On the Government's motion, one of the copyright counts was dismissed before the case was submitted to the jury. Brief for Appellee 1–2 & n. 2.

5. See note 4 *supra*.

transportation offense. Additionally, he contests the sufficiency of the proof to demonstrate that he lacked authority to distribute and sell the tapes in question. He also complains of the District Court's admission of evidence that previously he had trafficked in pirated tapes and asserts that prejudicial imprecision infected the Court's cautionary instruction on use of that "bad acts" evidence. We sustain the first challenge and consequently reverse Whetzel's conviction on the transportation counts with direction to dismiss those charges.[6] We discern no other reversible error, however, and accordingly affirm the conviction on the copyright infringement counts.[7]

II

To show that the tapes Whetzel transported into Maryland were in each instance worth at least $5,000—an essential element of the crime charged in the two transportation counts[8]—the Government at trial offered extensive evidence as to the value of a license to legally produce and distribute tapes or records embodying the copyrighted sound recordings incorporated in Whetzel's tapes. For example, a vice-president of ABC Records testified that procurement of a license to copy the recordings Whetzel's tapes unlawfully duplicated would cost from $5,000 for The Captain and Tennille's "Can't Stop Dancing" to "millions" for Fleetwood Mac's "Rumours."[9] The

Government asserts that the tapes Whetzel transported and sold to the FBI agent were goods "stolen, converted or taken by fraud," and thus subject to the transportation statute, because the sounds they had captured were taken without the copyright holders' permission.[10] It was, the Government says, the aggregation of sounds, not the tangible medium in which they were fixed, that was stolen; and it was this intangible property, the Government maintains, that was transported. Consequently, the argument concludes, it is the value of this intangible property that should determine whether the statutory requirement was satisfied, and that is best measured by the value of a license to produce the copyrighted tunes.

We are not persuaded by the Government's syllogism. Section 2314 is violated only when the property *transported* is worth at least $5,000. Whetzel was not transporting the right to produce legitimate tapes, and evidence as to the value of that right was therefore irrelevant. To be sure, the tapes were worth something because of the sounds reproducible from them, but that value would be reflected in whatever market prices the tapes themselves could command.[11]

"Value," as used in Section 2314, is defined in Section 2311 to mean "the face, par, or market value, whichever is the greatest."[12] The only evidence tending to

6. Part II *infra*.

7. Parts III, IV and V *infra*.

8. See note 2 *supra*.

9. Trial Transcript (Tr.) 257, 258. These were estimates of what it would cost to purchase the right to begin manufacture of tapes and records containing the sound recordings Whetzel's tapes infringed and do not include royalties which accrue as tapes and records are sold.

10. We do not doubt that criminal copyright infringement may be the underlying crime in a § 2314 violation. See *United States v. Atherton*, 561 F.2d 747, 752 (9th Cir. 1977); *United States v. Drebin*, 557 F.2d 1316, 1328 (9th Cir. 1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978).

11. *Cf. United States v. Bottone*, 365 F.2d 389 (2d Cir.), *cert. denied*, 385 U.S. 974, 87 S.Ct.

514, 17 L.Ed.2d 437 (1965) (papers describing manufacturing processes, knowledge of which was worth more than $5,000, fell within § 2314 notwithstanding that stolen information was transported on paper legitimately obtained); *United States v. Lester*, 282 F.2d 750 (3d Cir. 1960), *cert. denied*, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961) (photostatic copies of valuable geophysical maps worth more than $5,000 are within statute, though no evidence of true market therefor was adduced); *United States v. Greenwald*, 479 F.2d 320 (6th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973) (documents containing trade secrets are "goods, wares, [or] merchandise" within § 2314).

12. "'Value' means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a

indicate a market value for the tapes Whetzel transported was the testimony as to the prices the FBI agent paid for them. That value falls far short of the requisite $5,000, even if for purposes of satisfying the value requirement of Section 2314 the two transactions may be considered together—a question we need not decide.[13]

The Government maintains that decisions under Section 2314 support its construction of the value requirement of that section. As we read the cases, however, they lend no aid to the Government's position. Its strongest authority, *United States v. Drebin*,[14] a Ninth Circuit decision, involved transportation of unauthorized prints of motion pictures. After noting that the cost of the production and the revenues received from showings of the films which the prints infringed exceeded $1,000,000, the court discussed other substantial evidence in the case indicating the value of the transported prints on a "thieves" market.[15] That the court would not have deemed evidence of the former sort capable of establishing the statutory amount is made clear by its subsequent opinion in *United States v. Atherton*,[16] where overwhelming evidence of the huge box office receipts from the film "The Exorcist" was deemed insufficient to show that a 16-millimeter print thereof—a size unsuitable for theatrical distribution—was worth $5,000. The Government's position prompts us to add that the value of a license is much more likely to be relevant proof of market value in a prosecution for transporting a pirated print of a movie than in a situation such as the one at hand. Prints of movies are seldom sold;

rather, they are licensed to exhibitors.[17] In the music industry, by contrast, licenses to manufacture and distribute tapes and discs embodying sound recordings are common, but tapes and records, as we all know, are sold for personal use.

We conclude, then, that the Government failed to offer proof that would permit a jury to reasonably infer that the merchandise Whetzel transported had a value of $5,000. That requires dismissal of the Section 2314 counts.

### III

With respect to one of the copyright counts, it is conceded that the Government proved that the tapes Whetzel sold were unauthorized duplications of copyrighted sound recordings. On the remainder of the infringement counts, however, Whetzel argues that the Government did not negate the possibility that the vended tapes were manufactured and distributed under sublicenses granted by licensees of the copyright holders.

We disagree. In the first place, the trial record rules out this possibility for several of the counts.[18] More importantly, appellant overstates the burden borne by the Government. It was not required to disprove every conceivable scenario in which appellant would be innocent of infringement.[19] Rather, the standard remains that an accused is entitled to a judgment of acquittal "only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reason-

---

single indictment shall constitute the value thereof." 18 U.S.C. § 2311 (1976).

**13.** Where a series of shipments or transactions "have enough relationship so that they may properly be charged as a single offense, their value may be aggregated." *Schaffer v. United States*, 362 U.S. 511, 517, 80 S.Ct. 945, 949, 4 L.Ed.2d 921, 926 (1960). See note 12 *supra*.

**14.** *Supra* note 10.

**15.** 557 F.2d at 1328.

**16.** 561 F.2d at 752–753.

**17.** See *United States v. Wise*, 550 F.2d 1180, 1190–1191 (9th Cir.), *cert. denied*, 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977).

**18.** See Tr. 145, 239–240, 242, 259, 261, 269, 272, 301, 312, 339, 351.

**19.** See, *e. g., Holland v. United States*, 348 U.S. 121, 139–140, 75 S.Ct. 127, 137–138, 99 L.Ed. 150, 166–167 (1954); *United States v. Coombs*, 150 U.S.App.D.C. 333, 334, 464 F.2d 842, 843 (1970).

able doubt." [20]   That certainly is not the situation here.

■ After demonstrating that Whetzel's tapes were duplicates of copyrighted sound recordings, the Government introduced persuasive evidence that they were infringing. Their labels, listing a manufacturer with a non-existent address, their low price, and the circumstances of their sale all connoted an illicit origin. And there was a complete absence of anything that would suggest that the tapes were legitimate.[21] In short, on the basis of the proof adduced at trial, a juror would be justified in concluding beyond a reasonable doubt that the tapes Whetzel sold to the FBI agent were pirated.

### IV

■ Whetzel also contends that the District Court erred in admitting evidence that in the past he had manufactured and distributed pirated tapes. This presentation was designed to show that Whetzel committed the infringing acts charged in the indictment wilfully and for profit—indispensible ingredients of a criminal copyright violation [22]—and that he knew the tapes he transported were unauthorized—a prerequisite to a Section 2314 violation.[23]   Questions as to Whetzel's state of mind were naturally among the most critical at trial, for the physical acts proscribed were videotaped.[24] We find no infirmity in the District Court's determination that this bad acts evidence was relevant to the issues the jury was called upon to resolve and that its probative value outweighed its prejudicial effect.[25]

### V

■ Lastly, Whetzel decries the District Court's formulation of a cautionary instruction informing the jury on the legitimate use of the evidence of his prior copyright-infringing activities. He complains that the instruction in effect told the jury that this evidence *demonstrated* that he possessed the proscribed mental state. He also argues that the instruction was improperly constricted to only some of the bad acts evidence.

Since no objection to the instruction was voiced at trial, Whetzel's claims are cognizable here only if they indicate plain error.[26] The first assignment of error wrenches one statement of the trial judge from context. Fairly interpreted, the instruction did not invade the jury's province.[27]

**20.** *United States v. Davis*, 183 U.S.App.D.C. 162, 164, 562 F.2d 681, 683 (1977), citing *United States v. Fench*, 152 U.S.App.D.C. 325, 333, 470 F.2d 1234, 1242, *cert. denied*, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973), and *United States v. Lumpkin*, 145 U.S.App.D.C. 162, 168, 448 F.2d 1085, 1091 (1971).

**21.** The "first sale" doctrine, relied upon by Whetzel and applied in *United States v. Atherton*, *supra* note 10, and *United States v. Drebin*, *supra* note 10, is of no help to him. That doctrine "holds that the exclusive right to vend is limited to the first sale of any one copy and exerts no restriction on the future sale of that particular copy." *American Internat'l Pictures, Inc. v. Foreman*, 400 F.Supp. 928, 933 (S.D.Ala. 1975).   See 17 U.S.C. § 27 (1976). The tapes Whetzel peddled obviously were never the subject of "first sale" transactions entered into by copyright holders or their agents; the Government's proof, if accepted, demonstrated that the tapes themselves were unauthorized.

**22.** See 17 U.S.C. § 104(b) (1976), quoted in note 1 *supra*.

**23.** See note 2 *supra*.

**24.** Fed.R.Evid. 404(b) sanctions rather broad use of evidence of prior bad acts, compare *Drew v. United States*, 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1965), but admission of such evidence is subject, of course, to the general injunction that its probative value outweigh its prejudicial effect. Fed.R.Evid. 403.

**25.** See text and note at note 29 *infra*.

**26.** Compare *United States v. Robinson*, 174 U.S.App.D.C. 224, 230 n. 10, 530 F.2d 1076, 1082 n. 10 (1976) with *United States v. McClain*, 142 U.S.App.D.C. 213, 217–218, 440 F.2d 241, 245–246 (1971).

**27.** Tr. 440–441.   See *Henderson v. Kibbe*, 431 U.S. 145, 152–153 & n. 10, 97 S.Ct. 1730, 1736 & n. 10, 52 L.Ed.2d 203, 211 & n. 10 (1977); *Cupp v. Naughten*, 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373 (1973); *Boyd v. United States*, 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857, 859 (1926).

On the other hand, the cautionary instruction was by its terms limited to Whetzel's own statements concerning his past infringement activity; [28] other evidence of that activity was not expressly made subject to the limiting instruction. Nevertheless, this imprecision could easily have been rectified by a timely objection. And in view of the unimpeached videotape of the sale transactions, the danger of misuse of the Government's bad acts presentation—that the jury would infer from this showing of Whetzel's poor character that on the occasion charged he acted in conformity therewith [29]—is scarcely significant. We surely cannot characterize the instruction's underinclusiveness as "plain error[ ] affecting substantial rights." [30]

Whetzel's conviction on the two Section 2314 counts must be overturned for insufficiency of evidence that the tapes he transported had a value of $5,000. The District Court's judgment is affirmed in all other respects.

*So ordered.*

---

28. Tr. 440–441.

29. See Fed.R.Evid. 404(b).

30. Fed.R.Crim.P. 52(b).