**UNITED STATES of America,**

v.

**Melissa Ann PHILLIPS, a/k/a Melissa Edwards, a/k/a Melissa Ann Phillips Smith.**

**Crim. No. 79–41.**

United States District Court, E. D. Kentucky, Covington Division.

June 12, 1981.

James E. Arehart, Asst. U. S. Atty., Lexington, Ky., for plaintiff.

Kurt Philipps, Spalding, Grause, Robinson, Arnzen, Philipps & Arnzen, Covington, Ky., for defendant.

BERTELSMAN, District Judge.

## MEMORANDUM OPINION

### FACTS

This dramatic and unusual case, which was one of the most spellbinding that this writer has ever seen enacted on the forensic stage, gave rise to several evidentiary rulings which are the subject of this opinion.

The protagonists were the defendant Melissa Phillips and her husband Marion "Buster" Phillips. The ingenue's role was played by Melissa, who was 18 years old at the time of the events herein described. It was admitted that Melissa shot and almost killed two United States Marshals in an attempt to effect the escape of her husband Buster, as he was being brought into the federal courthouse at Covington, Kentucky, for a trial on a bank robbery charge.[1]

---

1. Melissa and her husband Buster were charged in a 14-count joint indictment. Count I alleged a conspiracy to violate various federal statutes, which substantive violations were alleged in Counts II, III, IV, V, VI, VII, IX, X, and XI of the indictment. Counts II and III charged Melissa with assaulting two deputy United States Marshals with a deadly and dangerous weapon in violation of 18 U.S.C. § 111. Count IV charged Buster with an assault on a deputy U.S. Marshal in violation of 18 U.S.C. § 111. Counts V and VI charged Melissa with assaulting two deputy U.S. Marshals with a dangerous weapon with intent to commit murder and with intent to assist the escape of a federal prisoner in violation of 18 U.S.C. § 113(a), (b), (c), and (f). Count VII charged Buster with assault on a deputy U.S. Marshal in attempting to escape from federal custody in violation of 18 U.S.C. § 113(b). Count VIII charged Buster with inducing Melissa to make an assault on a federal officer in violation of 18 U.S.C. § 111 and 18 U.S.C. § 2. Count IX charged Melissa with attempting to rescue and assist the escape of Buster Phillips in violation of 18 U.S.C. 752(a). Count X charged Buster with attempting to escape from federal custody, a violation of 18 U.S.C. § 751(a). Count XI charged Melissa with an attempt to commit murder and manslaughter on federal property in violation of 18

Melissa's defense was to cast Buster as the villain of the piece, a role which he voluntarily and enthusiastically assumed. Buster portrayed himself as a Svengali of sorts who had induced Melissa to commit the offense under hypnosis. Further, the defense contended, the systematic hypnotic program to which Buster had subjected Melissa over a period of several years had unhinged her mind to the point where she was legally insane at the time of the shooting.

As the curtain rose in the courtroom melodrama, the marshals described how, as they were bringing Buster into the federal building on the morning of October 2, 1979, to be tried for bank robbery, Melissa was waiting in the foyer. Since the marshals had been accustomed to seeing her in the vicinity during preceding trial days, they paid little attention. Suddenly, Melissa drew a revolver from her purse, and stood there indecisively.

"Shoot 'em, baby, shoot 'em," Buster cried out, whereupon Melissa opened fire on the leading marshal, Marshal Carney. Marshal Riffe, who was coming through the doorway into the vestibule behind the manacled Buster, grabbed him by the hair and fell backwards out the door, pulling Buster after him.

Marshal Carney having fallen after being shot and momentarily stunned, Melissa went out through the door and stood on the steps of the courthouse again indecisively. At that point Marshal Carney emerged, and saw Buster struggling with Riffe in an attempt to seize his sidearm. Carney, acting with incredible self-possession, considering he had suffered a serious head wound, fired at Buster, who was on top of Riffe, hitting Buster in the shoulder. At that point Buster gave up the struggle and commanded Melissa, "Run, baby, run." Melissa fled down the street and was captured without a struggle about a block away a few minutes later.

On the defense side of the case, as the dramatic action built towards a climax, Buster himself took the stand, having been brought from the federal penitentiary at Marion, Illinois. He vividly described for the court and the jury how, over a period of years beginning long before these events occurred, he had obtained total control over Melissa's will. He had been hypnotizing her since she was 15 years old, he said, sometimes 10 or 15 times a day. He had made her believe that he was her mother and father, and her Lord and God. He had placed in her mind the actual memory of his having held her immediately after her birth, and of his having rescued her from drowning when she was nine years old (a time when he had not even known her). Under his hypnotic influence, he said, she had actually seen him be crucified, die, and rise again, and believed he was her savior and redeemer. He described with technical accuracy the manner in which such a hypnotic program could have been accomplished.

Therefore, his testimony was, since Melissa believed he was God, she was unable to distinguish right from wrong, since "if God tells you to do something, you think it's right." He had, he told the packed courtroom, instructed her (during her visits to him while he was held prior to trial in the local jail) how to manage the escape in the manner described above. He had, he claimed, implanted in her mind the compulsion to meet him and the marshals each morning, as he was brought in for trial, to have a gun ready, and to respond to his commands as to when to use it.

The defense also called a psychiatrist who had examined Melissa while she was being held at the federal penitentiary at Alderson, West Virginia, after being declared incompetent to stand trial. This witness

U.S.C. § 113. Count XII charged Buster with inducing Melissa to attempt to commit murder and manslaughter in violation of 18 U.S.C. § 113 and 18 U.S.C. § 2. Count XIII charged Melissa with knowingly using a firearm in committing an offense against the United States, in violation of 18 U.S.C. § 924(c). Count XIV charged Buster with inducing Melissa to use a firearm in committing an offense against the United States in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2.

testified that she was legally insane at the time of the shooting.

Thus, the defense being an amalgam of hypnosis and insanity, Melissa's mental state at the time of the shooting was the principal issue at the trial.

## THE ISSUES

The following evidentiary issues, which are the subject of this opinion, arose in the course of this suspenseful jury trial:

1. Was the Assistant United States Attorney entitled to have the government expert psychiatrist sit with him during the trial to assist him in evaluating the psychiatric testimony?

2. Could the defense introduce a copy of a learned psychiatric treatise into evidence as an exhibit in support of its theory of the case?

3. Could the psychiatrist called by the government on rebuttal testify on the basis of hospital records, a consulting psychiatrist's report, and a team diagnosis made by a staff of a mental hospital, that Melissa was legally sane at the time of the event?

4. Could the government introduce evidence of a prior "bad act" by Melissa, namely that she had fired a gun similar to or the same as the one used in committing the alleged offense at a neighbor, during a neighborhood dispute which occurred a few weeks prior to the escape attempt?

## Non-exclusion of the Government's Expert

As stated above, the principal defense in this case was insanity, associated with a claim that by reason of hypnosis the defendant was unable to form the requisite criminal intent. Expert psychiatrists and psychologists were called on both sides of these issues.

The attorney for the government requested the court to permit the prosecution's chief psychiatric witness to sit with him at counsel table during the trial even though the psychiatrist was later to testify. The assistant United States Attorney trying the case stated that he had little experience in dealing with this kind of testimony and needed the assistance of the psychiatrist in deciding whether or not and how to cross-examine the defendant's expert and in preparing the direct examination of his own expert. The defendant objected.

The matter is governed by F.R.Ev. 615.[2] The degree of necessity required for the court to permit an exception to the exclusionary rule to permit an expert, who is later to testify, to sit in and assist an attorney is one that addresses itself to the sound discretion of the court.[3]

In the instant case the court exercised its discretion to permit the expert to be present and assist the prosecution during the testimony of the defendant's experts only, and not during other parts of the trial. The court felt that providing the prosecutor with this assistance, which the court believed he genuinely needed, would save time and promote the search for truth. At the same time, excluding the expert during the other portions of the trial would accomplish the purpose of the exclusionary rule, i. e., to limit the witness' opportunities consciously or unconsciously to tailor his testimony in the light of that of other witnesses.

## Use of a Learned Treatise

During the defendant's case, counsel had an expert witness qualify a learned treatise

---

2. **"Rule 615. Exclusion of Witnesses**

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause."

3. Cf. *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 630 (6th Cir. 1978) cert. den'd 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978) (implies that permitting presence of expert may be mandatory, where expert is to base his testimony on what he has heard in court); *United States v. Rollins*, 522 F.2d 160 (2d Cir. 1975); *United States v. Thor*, 512 F.2d 811, cert. den'd 423 U.S. 1014, 96 S.Ct. 445, 46 L.Ed.2d 384.

on psychiatry as a reliable work. Then, after the expert had departed and was no longer available, counsel moved that a photocopy of a chapter from the treatise be introduced as an exhibit and passed to the jury.

■ The motion had to be denied. While F.R.Ev. 803(18) permits the contents of learned treatises to be used as substantive evidence, if established as reliable authority, it does not permit them to be introduced as physical exhibits.[4] Rather, relevant portions are to be read to the jury. This was a deliberate compromise by the drafters of the rule to allow the use of such treatises while preventing them from having undue effect.[5]

### The Testimony of the Government's Psychiatrist

The government called as its principal expert witness Dr. Richard McIlroy, a psychiatrist employed by St. Elizabeth Hospital,[6] Washington, D.C. Dr. McIlroy's principal duties were in the forensic psychiatric division of the hospital, which examines federal prisoners for competency to stand trial and also renders opinions as to whether or not defendants suffer from mental diseases or defects which affect their criminal responsibility for the crimes for which they are charged.

■ Dr. McIlroy testified that his expert opinion was that Melissa was legally sane at the time of the commission of the crimes for which she was on trial.

In the course of his testimony, and as part of the basis for his opinion, the doctor referred to, and in part described the contents of, certain nursing notes both from the hospital where he was employed and a previous institution in which the defendant had been confined. He also undertook to testify to the contents of a report of a consulting psychiatrist at St. Elizabeth's, who had also observed Melissa, using it also as a factor in forming his own opinion. In addition, Dr. McIlroy offered to testify to a report rendered by a team of some 40 persons of different professional disciplines, who had rendered a team diagnosis of Melissa, based on their observations of her during her stay at St. Elizabeth's.

An objection was made by defense counsel on the basis of hearsay and a violation of the right of confrontation. The objection was overruled on the ground that F.R.Ev. 703 permits an expert to testify to the facts or data on which his opinion is based, even if such facts or data are neither admitted nor admissible in evidence, if they are of a type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[7]

The drafters of the Federal Rules of Evidence specifically contemplated that expert witnesses, including medical witnesses, would be permitted to testify in the manner described above. This is demonstrated by the following excerpt from the Advisory Committee Note to Rule 703:

---

4. **"Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial.**
   The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

   \* \* \* \* \* \*

   **Rule 803(18) Learned treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon by him on direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits."

5. Saltzburg & Redden, Federal Rules of Evidence Manual 535 (2d ed. 1977).

6. St. Elizabeth Hospital is owned by the federal government; therefore, Dr. McIlroy is an employee of the United States.

7. **Rule 703. Bases of Opinion Testimony by Experts.**
   "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

"Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life and death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." Advisory Committee's Note to Rule 703.[8]

Although it was clear to the court that Dr. McIlroy could refer to and describe in his testimony the materials mentioned above, the court as an additional precaution directed the prosecutor to qualify these materials as business records. The prosecutor was able to do this under F.R.Ev. 803(6) through Dr. McIlroy's testimony, even though the custodian of the records was not present.[9] Rule 803(6) specifically permits business records to be qualified by the testimony of a witness other than the custodian if the witness is familiar with how they are kept.[10] Dr. McIlroy's testimony showed that he had been an employee of the hospital for some years and was familiar with the way the records were kept; and he testified that the criteria prescribed by the Rule had been observed. It was not a proper objection to the entry of the records that they contained opinions or diagnoses, because the rule specifically so permits.[11]

8. *See* Saltzburg & Redden, *supra*, at 425; *Bauman v. Centex Corp.*, 611 F.2d 1115 (5th Cir. 1980) (accountant testified in part from library research); *United States v. Genser*, 582 F.2d 292 (3d Cir. 1978) (IRS agent could testify as expert to opinions based on other agents' audit and describe results of that audit); *Jenkins v. United States*, 307 F.2d 637 (D.C.Cir.1962). *Cf. Smith v. Ford Motor Co.*, 626 F.2d 784 (10th Cir. 1980).

9. "**Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial**

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

"(6) **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

10. *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir. 1980). The nurse's notes from the other institution were admissible as the business records of St. Elizabeth's, because they became such when received by the latter institution. *Cf.*

*United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977); *United States v. Reese*, 568 F.2d 1246, 1248 (6th Cir. 1977).

11. Once the materials described above were qualified as business records, defense counsel withdrew his objection. Nevertheless, a word should be said about the applicability of the confrontation clause in matters of this kind. *See United States v. Oates*, 560 F.2d 45 (2d Cir. 1977). This case is clearly distinguishable from *Oates*, even if that case would be followed in this circuit. First of all, Dr. McIlroy was not a law enforcement officer, even though he is a government employee. *See* F.R.Ev. 803(8). His function is to make medical evaluations for the court. Another expert with a similar function at another institution testified for the defense in this case. Even more importantly, Dr. McIlroy was indeed the true witness against the defendant, and she did have the opportunity to confront him. In *Oates*, the court seemed to feel that the true witness against the defendant was not present in court, and his testimony was being presented in the form of a report by a witness who really knew little about the case. Under those circumstances, the court's concern about the applicability of the confrontation clause was clearly justified. The analysis of the court in *United States v. Genser*, 582 F.2d 292, 299 (3d Cir. 1978) is applicable here, where the court permitted an IRS agent to testify to opinions based on the audit of other agents.

"... However, the confrontation clause does not by itself prohibit the use of hearsay testimony. *See California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Rather, it focuses upon the right of the accused to 'confront and probe each of his

*Evidence of Another Shooting*

As has been stated, defendant's defense in this case was that she was insane at the time of the shooting of the marshals, because her mind had been so unhinged by Buster's hypnotic programming that she was unable to distinguish right from wrong, or control her actions. In the alternative, she argued that as a result of the hypnosis she was unable to form the requisite criminal intent.

Solely for the purpose of rebutting this defense, the United States offered a witness to testify that the defendant fired a shot at him during a neighborhood dispute with the same pistol used later in the shooting of the marshals, or a very similar pistol, a few weeks prior to the escape attempt. The relevance of this testimony was that it tended to show she was capable of forming the intent to commit this violent act at a time when she was not under her husband's influence.

The evidence was offered as a "bad act" under F.R.Ev. 404(b).[12] The defense strongly argued that it was not sufficient for the introduction of the evidence that it merely bore some similarity to the crime for which the defendant stands accused, but must show a pattern strong enough to approach a modus operandi.[13]

This court analyzed the factors involved in this most difficult question and found that the proof of the other bad act was plain, clear and convincing. The other bad act was not too remote; the evidence was for a purpose sanctioned by the Federal Rules of Evidence, namely proof of intent or state of mind; the bad act was introduced to prove an element of the charged offense, that is criminal intent, an issue material in the case; and there was a substantial need by the United States for the probative value of the evidence.[14] The court also found that the probative value of the evidence was so high as not to be outweighed by an unduly prejudicial effect.[15]

Applying these factors, this court held that the evidence should be admitted. In making this ruling, this court was most persuaded by *United States v. Hearst,*[16] where the defense was that the defendant in committing a bank robbery acted under duress. The *Hearst* court affirmed the trial court's admission of the fact that she had subsequently committed another bank robbery in association with the same persons at a time when she obviously was not under duress. Particularly pertinent was the *Hearst* court's statement that the other crime or bad act must be similar to the offense charged only if it is the similarity of

accusers.' *United States v. [Williams],* 447 F.2d 1285, 1289 (5th Cir. 1971) (footnote and citation omitted). *Here, at the most, Dorgeval was testifying to his own opinion,* based upon the audit, and the appellants had a full opportunity to confront his opinions and reduce their impact in any manner available, including questioning his reliance upon the audits without having been involved in the auditing process himself." *See Williams, supra,* at 1288–90."

*See* Saltzburg & Redden, (1980 Supp.) 220. *Cf. United States v. Kendricks,* 623 F.2d 1165 (6th Cir. 1980) where the court seemed to imply that evidence which falls within a well recognized hearsay exception has sufficient reliability to meet the requirements of the confrontation clause. *Cf. Reardon v. Manson,* 491 F.Supp. 982 (2d Cir. 1980); *Meeks v. Jago,* 548 F.2d 134 (6th Cir. 1976); *United States v. Beasley,* 438 F.2d 1279 (6th Cir. 1971).

**12.** **"Rule 404. Character Evidence not Admissible to Prove Conduct; Exceptions; Other Crimes**

**"(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**13.** *See United States v. Phillips,* 599 F.2d 134 (6th Cir. 1979) (involving the first bank robbery trial of this defendant's husband).

**14.** These factors are found in *United States v. Myers,* 550 F.2d 1036 (5th Cir. 1977).

**15.** *See* F.R.Ev. 403.

**16.** 563 F.2d 1331 (9th Cir. 1977). The court there pointed out that the defenses of insanity and duress were quite similar. 563 F.2d at 1336. *Cf. United States v. Stephens,* 569 F.2d 1372 (5th Cir. 1978); *United States v. Whetzel,* 589 F.2d 707 (D.C.Cir.1978).

the crimes that underlies the relevance of the evidence, such as where it is offered to prove a modus operandi. In the case at bar, as in *Hearst*, the relevance of the evidence did not depend on the similarity of the crimes, "but on the circumstances surrounding the occurrence of the . . . crimes which indicated (defendant) had not acted under duress when she participated in the bank robbery."

 In the instant case, the defense attorney attempted to picture the defendant as an immature young woman, who would have been incapable of committing a violent act but for the insidious influence of her husband. The United States was, then, entitled to offer this other evidence to show that she could deliberately commit a vicious and violent act at a time, not remote from the time of the crime with which she was charged, when she was not under her husband's influence. The evidence was admitted solely on the issue of her state of mind, and an appropriate limiting instruction given.

## CONCLUSION

Rulings based on the above analyses were made during the course of the trial, the conclusion of which Melissa was found guilty on all counts, except that of assault with intent to commit murder, and sentenced to 30 years imprisonment. The case is at this writing on appeal.