UNITED STATES of America,
Plaintiff-Appellee,

v.

William Richard MINOR,
Defendant-Appellant.

No. 83–5152.

United States Court of Appeals,
Ninth Circuit.

Argued Jan. 10, 1985.
Submitted Jan. 29, 1985.
Decided March 28, 1985.

Charles C. Lee, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

T.J. Pantaleo, Eric S. Engel, Pantaleo & Kudon, Los Angeles, Cal., for defendant-appellant.

Before BROWNING, Chief Judge, KENNEDY and ALARCON, Circuit Judges.

## PER CURIAM:

Minor was convicted of six counts of copyright infringement under 17 U.S.C. § 506(a), two counts of interstate transportation of stolen property under 18 U.S.C. § 2314, and one count of conspiracy to commit these offenses under 18 U.S.C. § 371. He appeals his conviction as to all counts. We affirm.

## I. FACTS

Beginning in 1976 or 1977, Minor and his parents accumulated a large quantity of phonorecords, particularly Elvis Presley albums. Operating out of their homes in south Florida, they developed a mail-order business under the name "Richard Minor." Minor's father was listed as the owner of the business on the occupational license, but Minor described himself as the president of the company.

Co-defendants Theaker and Dowling began manufacturing and distributing bootleg records in 1976. They too specialized in Elvis Presley records. Theaker manufactured records at a pressing plant in California and shipped them to Dowling in Maryland.

In early 1978, Minor sent a quantity of 45 r.p.m. Presley records to Theaker in exchange for Theaker-made Presley LP's. They conducted several other record transactions, and spoke with each other many times on the telephone. In mid-1979, Theaker shipped records from California to Minor in Florida, where they were kept until they could be reshipped to Dowling in Maryland, with the apparent purpose of confusing the FBI, which had been investigating Theaker and Dowling.

In December 1979, Minor paid Theaker and Dowling $40,000 to manufacture copies of each of four bootleg Presley albums. Also during 1979, Theaker and Dowling sent Minor the "mothers" of four bootleg Presley albums (known as "junk LP's" because of their poor sound quality).[1] In June 1980, Theaker sent Minor four other bootleg records, along with 5,000 labels for each separate title. Theaker also sent Minor the "mothers" for these albums, explaining that Minor would have to press his own supply of records because Theaker's plant had been raided.

One of Minor's employees testified Minor knew Theaker and Dowling had been investigated by the FBI, but said nothing had been proved against them. Minor told one of his employees that some of the Presley records were of "touchy or questionable legality" because the copyright ownership of the songs on these albums was in dispute.

The records charged in the indictment were manufactured by Theaker and Dowling, and were part of a bulk shipment to "Richard Minor" from Theaker, using a false name. Minor signed for 20 cartons

---

[1] A "mother" is an electroplated metallic disc of solid nickel duplicating the original lacquer used to prepare a master recording of an LP.

The "mother" is used to make one or more "stampers," negative metal discs commonly used to mold and press records.

from this shipment that had been damaged in transit.

In January 1980, a special agent of the FBI ordered a quantity of records from a "Richard Minor" advertisement. He sent a check for $215.00 to "Richard Minor." The check was endorsed "Richard Minor" by someone other than Minor. The agent received the records on January 29, 1980, with a refund check signed by Minor's mother. Included on the records were six Presley songs, each copyrighted by one of four companies. Representatives of the copyright holders testified that none of the songs was licensed to Theaker, Dowling or Minor, and that no royalties had been paid to the copyright holders.

In March 1982, the FBI executed search warrants at the residences of Minor and his parents, as well as a warehouse and rented storage space. The searches produced thousands of bootleg records and equipment for manufacturing records. The warrant for Minor's house authorized seizure of an album called "From the Beach to the Bayou," as well as devices and equipment by which copies of the album could be made. During the search agents discovered and seized copies of an album called "The Last Farewell" and photographic negatives of the cover, all of which were in plain view.

## II.  DISCUSSION

### A.  *Copyright Infringement*

#### 1.  *Knowledge of Lack of First Sale*

◼ Minor concedes that evidence was presented to show he participated in the manufacture and distribution of bootleg records in the past and that he had prior dealings with Theaker and Dowling, but asserts this evidence is insufficient to show he knew the specific records charged in the indictment were not subject to a valid "first sale." The "first sale" doctrine, now codified in section 109 of the Copyright Act of 1976, is to the effect that when a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particu-

lar copy and cannot restrict subsequent sales or transfers of that copy. *United States v. Wise*, 550 F.2d 1180, 1187 (9th Cir.1977). To negate the possibility of a "first sale," Minor would require the government to show, with regard to each record charged, that Minor knew neither Theaker nor Dowling had secured a license from or paid mechanical royalties to the individual copyright owners, and that no "Notice of Intention to Obtain Compulsory License" had been filed with the copyright office.

◼ If accepted, this position would place an almost impossible burden of proof on the government in criminal copyright infringement cases. The settled rule is that the government may show that the defendant knew a particular copy of a copyrighted work had not been sold first by the copyright owner as an inference from circumstantial evidence. *United States v. Moore*, 604 F.2d 1228, 1232–33 (9th Cir.1979).

◼ On the evidence in this record, a rational jury could find beyond a reasonable doubt that Minor knew the records charged in the indictment were not the subject of a valid first sale, and was therefore a willful infringer. The following circumstantial evidence is of particular relevance.

(1) Midcap and Hubbard, employees of Theaker and Minor respectively, testified that Minor manufactured various albums containing bootleg Presley songs, and that these albums were traded by Minor for other albums manufactured by Theaker and Dowling.

(2) Midcap also testified that Theaker sent "mothers," "stampers" and labels to Minor in 1979 and 1980 so that Minor could press his own albums. This testimony was corroborated by Anderson, an employee of Dowling, who stated that Theaker and Dowling relied on Minor to send them records when they ran out, and that they talked to Minor about pressing his own albums.

(3) Three of Minor's former employees gave testimony showing that Minor knew he was dealing in bootleg records. Richmond testified he realized he was handling bootleg records, and stated that Minor told him certain records were of "touchy or questionable legality" because copyright ownership was "in dispute." Minor wondered whether his phones were tapped, and told his employees to be wary of anyone wishing to discuss bootleg records over the phone. Hubbard testified Minor "educated him" on the subject of bootleg records. Vettel testified Minor told him the storage space was rented in his mother's maiden name because the records stored there were "hot."

(4) Detective Gumbinner, a Florida detective who questioned the Minors regarding an unrelated incident, testified Minor gave him a copy of a Presley album said to be worth $250, and told him it was a bootleg or pirated album.

(5) Among the items found in Minor's guest house during execution of the search warrant were letters addressed to Minor in which customers refer to orders for "bootlegs" and "boots."

### 2. *Proof That Minor Performed the Acts Charged*

■ Minor claims the evidence was insufficient to show that he, rather than the business "Richard Minor," performed the acts charged in the indictment. He attaches great significance to the fact that he did not receive or personally handle the check sent by the FBI agent to "Richard Minor," and the fact that the refund check sent to the agent was signed by his mother at his father's direction.

There was sufficient evidence from which the jury could infer that Minor controlled and directed the "family business." Richmond and Hubbard, former employees of Minor, testified that Minor was actively involved in the business and gave orders regarding the business on a daily basis. Richmond testified that Minor was personally responsible for deciding which records would be advertised and sold, and specifically for listing the infringing records in the "Richard Minor" catalogue from which the FBI agent made his order. He purchased, sold, traded, and even manufactured bootleg records in conjunction with Theaker and Dowling. The particular records charged in the indictment were manufactured by Theaker and Dowling and shipped to Minor, with Minor's knowledge.

### B. *Interstate Transportation of Stolen Property (ITSP)*

#### 1. *Applicability of Section 2314 to Copyrights*

■ Minor argues that since section 2314 requires the transportation of "goods, wares, merchandise, securities or money," it does not reach intangibles such as copyrighted music. Moreover, there was no proof the physical records, as distinguished from the musical compositions contained in them, were "stolen, converted or taken by fraud," as the statute requires. We rejected this argument on the appeal by Minor's co-defendant, Dowling. *United States v. Dowling*, 739 F.2d 1445, 1450–51 (9th Cir. 1984), *cert. granted*, —— U.S. ——, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985).

#### 2. *Value in Excess of $5,000*

Minor argues the goods charged in the indictment had a value less than $5,000, the jurisdictional minimum under section 2314. He contends it was improper to consider the market value of the infringing records because the musical compositions contained on the records rather than the records themselves were stolen. Because under 17 U.S.C. § 115(c)(2) the maximum amount a copyright holder could charge for use of his musical composition was $.0275 per composition, Minor claims the proper value under section 2314 was only $3,244.88.

■ We agree with the government that section 115(c)(2) is not the appropriate measure of value for the purpose of section 2314. Section 115(c)(2) fixes the royalty rate which must be paid to a copyright holder for a compulsory license. What Minor stole, however, was not the value of a

compulsory license, but the right of the copyright holders to control reproduction of their works. As the court noted in *United States v. Whetzel*, 589 F.2d 707, 710 (D.C.Cir.1978), the value of the right to reproduce the sounds contained on a bootleg tape is "reflected in whatever market price the tapes themselves [can] command." *See also United States v. Drebin*, 557 F.2d 1316, 1328–29 (9th Cir.1977).

■ Because the market value of the infringing records was a proper measure of value under section 2314, the district court did not abuse its discretion in refusing to permit expert testimony as to royalty rates as such testimony would have been irrelevant. *See Whetzel*, 589 F.2d at 710.

### C. *Conspiracy*

#### 1. *Sufficiency of the Evidence*

Minor's challenge to the sufficiency of the evidence of conspiracy duplicates the argument we have already rejected that there was insufficient evidence to prove he knew the records charged in the indictment were infringing or stolen, and therefore lacked the requisite scienter to be convicted of conspiracy. *See* Part II–A–1, *supra*.

#### 2. *Co-Conspirator Hearsay*

■ Minor claims the only evidence of his knowing participation in the Theaker-Dowling conspiracy was the testimony of Midcap and Anderson, consisting primarily of hearsay statements by Theaker and Dowling, his alleged co-conspirators. Minor asserts the only independent evidence of his involvement was his acceptance of delivery of 20 opened cartons from a bulk shipment sent by Theaker. He contends performance of such a "menial task" is insufficient to establish knowing participation in the conspiracy, and the statements of co-conspirators Theaker and Dowling therefore were not admissible against him.

There was ample evidence of Minor's knowing participation in the Theaker-Dowling conspiracy apart from the testimony of Midcap and Anderson. *See* Part II–A–1, *supra*. The testimony of Richmond, Hubbard, Lieurance and Vettel, all former employees of Minor and/or "Richard Minor," is especially relevant.

### D. *Motion to Suppress*

Minor appeals the trial court's denial of a motion to suppress records seized during execution of a search warrant that were not specifically described in the warrant. He concedes the records seized were in "plain view," but asserts the plain view doctrine is inapplicable because the incriminating nature of a bootleg record can only be definitively determined by scientific tests performed after seizure.

■ This argument is based on a misreading of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The plurality there held that the warrantless seizure of private possessions under the plain view doctrine is not justified unless it is "immediately apparent" to the police that the items observed are evidence of crime, contraband, or are otherwise subject to seizure. *Id.* at 466, 91 S.Ct. at 2038 (opinion of Stewart, J.). *See also Texas v. Brown*, 460 U.S. 730, 736–37, 103 S.Ct. 1535, 1539–40, 75 L.Ed.2d 502 (1983) (opinion of Rehnquist, J.); *United States v. Issacs*, 708 F.2d 1365, 1368–70 (9th Cir. 1983). The "immediately apparent" language does not mean, however, that an officer must "be possessed of near certainty as to the seizable nature of the items," *Texas v. Brown*, 460 U.S. at 741, 103 S.Ct. at 1542 (opinion of Rehnquist, J.); all that is required for a plain view seizure is "probable cause to associate the property with criminal activity." *Id.* at 741–42, 103 S.Ct. at 1542–43, *quoting Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). *See also Texas v. Brown*, 460 U.S. at 746, 103 S.Ct. at 1545 (Powell, J., concurring); *id.* at 748, 103 S.Ct. at 1546 (Stevens, J., concurring); *Issacs*, 708 F.2d at 1369.

■ The seizures in this case were appropriate under the "probable cause" standard. Special Agent McBride, the officer in charge of the search, stated in his affida-

vit in opposition to the motion to suppress that all of the items seized were immediately identifiable as probable contraband or evidence of illegal activity, based either on his own experience or the expertise of recording industry experts present during the search. *See Texas v. Brown,* 460 U.S. at 746, 103 S.Ct. at 1545 (Powell, J., concurring); *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Moreover, the government's search warrant affidavit, also prepared by agent McBride, states with particularity the indicia by which "bootleg records" could be identified, thereby guiding the discretion of the officers executing the warrant, and distinguishing this case from *United States v. Klein,* 565 F.2d 183, 186 (1st Cir.1977).[2]

■ Minor's reliance on *United States v. Sherwin,* 572 F.2d 196, 199–200 (9th Cir.1977), for the proposition that the plain view doctrine does not apply to seizure of first amendment materials is also misplaced. *Sherwin* involved the seizure of allegedly obscene magazines. The court held police officers could not make the initial probable cause determination of likely obscenity without infringing the first amendment. *See also United States v. Gilman,* 684 F.2d 616, 619 (9th Cir.1982). However, whether a given record is a probable "bootleg" is an essentially objective, mechanical determination. *See* Footnote 2, *supra.* It does not require the sensitive qualitative judgment required to determine whether material is probably obscene. There is therefore no compelling policy reason to require that a magistrate make the original assessment of probable cause.

### E. *Failure to Authorize Investigator Expenses*

Minor challenges the denial of his application for investigator travel expenses.

■ To establish that disallowance or limitation of investigative funds for an indigent defendant violates the statute or the Constitution, the defendant must have made a reasonable showing of necessity, and must demonstrate by clear and convincing evidence that the denial resulted in substantial prejudice. *Mason v. Arizona,* 504 F.2d 1345, 1352 (9th Cir.1974). Minor made no effort to advise the lower court of the lines of inquiry he intended to pursue, and has made no showing of prejudice from the denial of his request.

### F. *Statute of Limitations*

■ For the first time on appeal, Minor suggests the Second Superseding Indictment was barred by the three-year statute of limitations in 17 U.S.C. § 507. The statute of limitations is an affirmative defense waived unless raised at trial. *Biddinger v. Commissioner of Police,* 245 U.S. 128, 135, 38 S.Ct. 41, 43, 62 L.Ed. 193 (1917). Minor's argument that the statute of limitations is a jurisdictional bar, and therefore may be raised for the first time on appeal, is contrary to the law in this circuit. *See United States v. Krasn,* 614 F.2d 1229, 1236 (9th Cir.1980); *Forthoffer v. Swope,* 103 F.2d 707, 709 (9th Cir.1939).

■ We note that Minor's codefendant, Dowling, was sentenced to a cumulative prison term of eighteen months with probation for five years on condition that he pay a $5,000 fine and perform fifteen hundred hours of community service. *United States v. Dowling,* 739 F.2d 1445, 1447 (9th Cir.1984), *cert. granted,* — U.S. —, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985). It is not clear to us that the trial judge had the benefit of this information when he sentenced Minor to a cumulative prison term of eight and one-half years with probation for five years and a $90,000 fine. As far as we can tell, Dowling operated on a much larger scale and was more culpable than

2. The identified characteristics typically associated with bootleg records included the following: bootleg records normally display fictitious manufacturers' names on the labels or no names at all; they usually contain no printing on the album jacket; instead of printing on the album cover there is often a single sheet of two-colored paper inserted under the "shrink wrap" plastic covering; and bootlegs are often reproduced on multi-colored vinyl or on solid-colored vinyl other than the traditional black.

Minor. Minor had no prior convictions. In view of the disparity between the sentences, we think the district court should seriously consider exercising its power, under Fed.R.Crim.P. 35, to reduce the sentences which have been imposed. *See Wilson v. United States,* 335 F.2d 982, 984 (D.C.Cir.1964); *Scarbeck v. United States,* 317 F.2d 546, 569 (D.C.Cir.1963), *cert. denied,* 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077, *reh'g denied,* 375 U.S. 874, 84 S.Ct. 35, 11 L.Ed.2d 105.

AFFIRMED.