**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Wallace Murphy PLUM, a/k/a Porky Plum, Defendant-Appellant.**

No. 75–1834.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Sept. 21, 1976.

Decided July 11, 1977.

James N. Barber, Meredith, Barber & Day, Salt Lake City, Utah, for defendant-appellant.

Rodney G. Snow, Asst. U. S. Atty., Salt Lake City, Utah (Ramon M. Child, U. S. Atty., Salt Lake City, Utah, on the brief), for plaintiff-appellee.

Before HOLLOWAY, McWILLIAMS and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant-appellant Plum was convicted on an information charging that in August, 1973, in the Central Division of the District of Utah he had received and concealed approximately ninety-eight 10-troy ounce silver bars and approximately thirty-nine 25-troy ounce silver bars of a value of more than $5,000 which were moving as part of, and constituted interstate commerce, knowing the same to have been stolen, in violation of 18 U.S.C. § 2315. Defendant Plum received a 10-year sentence and appeals.

The Government's proof tended to show these facts. On July 25, 1973, Constitution Mint, a retail silver company located in Provo, Utah, delivered to the Railway Express Agency (REA) office six boxes labeled "machine castings" which in fact contained forty 25-troy ounce bars and one hundred 10-troy ounce bars of silver for shipment to Bob Rice in Nyssa, Oregon. Rice had purchased the silver for $7,690. The silver reached Boise, Idaho, but there the boxes were stolen over the week-end of July 28 and 29. The empty boxes were found a few days later in a trash barrel in the Boise REA warehouse, with only one bar of silver remaining.

Rick Young plead guilty to a charge of interstate transportation of stolen silver

and testified for the Government.[1] He said that he and his nephew, Steve Young, entered the Boise REA warehouse and stole the silver, that after finishing some work in a Boise theater they returned to Salt Lake City with the silver, and that they left it at Rick's parents' home.

Young testified further that he contacted Plum and met him at a park and showed him some of the silver. Young said that Plum asked him where he got the silver but he didn't tell him. He did later tell Plum that the F.B.I. was interested in the case after Plum had bought some of the silver and disposed of it through "a jeweler or something like that." (R. I, 75).

After their meeting in the park, Young and Plum went to Young's parents' house to pick up the silver. Young testified that later, accompanied by his nephew, he went to Plum's brother's apartment and transferred all but four bars of the silver to Plum. Young said one bar was left in Boise, his nephew got one bar, Young gave one bar to Mr. Brunner and gave another bar Young had kept to a Mr. Pasborg. (R. I, 102–03; R. II, 217–18). From the testimony of Rick and Steve Young and defendant this delivery of the silver to defendant was shown to have been within several days after the theft (R. I, 69–70; 82–83; 166–68, 172). Plum said he would take the silver to a couple of people to determine a price. He gave a $500 down payment and later an additional $500 to $700, based on an agreed price of around $1.00 to $1.25 per ounce (R. I, 70–71, 110–11).

The defense of Plum was that he did not know the silver was stolen when he received it and that the silver he received was not worth $5,000 or more, as the statute requires for the federal offense to be shown. On the latter point Plum's proof was to the effect that the quantity of silver was not nearly as large as the Government claimed.

Michael Boone testified for the defendant that before Rick Young contacted Plum,

Young told Boone that he had sold half of the silver and still had half of it left (R. I, 148). Chester Plum, the defendant's brother, testified that he was present when Rick Young and the defendant came to his apartment, that after Young left he and the defendant counted the bars, that they found 29 "big ones" and "21, 22 or 23 small ones," but that he was not sure of the count. (R. I, 153–57).

Defendant Plum testified that Rick Young had called him and arranged a meeting at Liberty Park. Young and Plum later drove to Young's parents' home and got the silver. Young and Plum went to Plum's brother's apartment. Plum's brother and defendant both said they hoped everything was "all right" about the silver. Young said "Yes, everything is fine." (R. I, 171).

Young accepted Plum's offer of $1.25 per ounce for the silver. Plum testified he didn't learn that the silver had been stolen until after Young's arrest. Plum said that Young gave him only twenty-nine 25-ounce bars and twenty-one or twenty-two 10-ounce bars for which he paid a total of $1,200. Plum testified he sold the silver to a jeweler for $2,000.

The defense also attempted to call Donald Pasborg and advised the court he would deny that he received one single bar of silver from defendant Plum, as Young had testified, but that instead he, Pasborg, had later received more bars in a larger group. However, the court appointed counsel to advise Pasborg about the consequences of testifying and the attorney told the court that Pasborg would exercise his Fifth Amendment rights. The trial court refused to allow Pasborg to take the stand for this purpose.

Further details about the evidence will be covered in discussing the appellate contentions, to which we now turn.

1. Young was convicted of third degree burglary, grand larceny and interstate transportation of stolen property and received concurrent sentences. At the time of trial he was on probation for the federal charge. (R. I, 61, 75–76).

# I
## The hearsay objections

Defendant Plum claims that there was prejudicial error in the admission of Government Exhibits 2, 6 and 7. Specifically he says that the backside of Exhibit 2 and Exhibits 6 and 7 were rank hearsay and not admissible under any exception to Rule 802 of the Federal Rules of Evidence. Plum argues that since these exhibits were crucial to the Government's position that the silver Plum bought was worth more than $5,000, there was reversible error. Appellant's Opening Brief, 7.

█ The backside of Exhibit 2 was a form with questions directed to and answers from Rice, the purchaser of the silver. The exhibit was a claim form used for the apparent purpose of getting information about the lost shipment and included a handwritten response above the signature of Robert Rice that the value of the contents of the shipment was $7,690.

Rice did not testify. Plum argues that there was no proof that Rice's declaration on value was made at or near the time Rice obtained the information, no proof that his source of information was accurate so that he (Rice) was a "person with knowledge" within Rule 803(6), and no proof that Rice made the declaration in the regular course of a business activity conducted by him.[2] Plum contends that the declarations were thus not within the exception provided by Rule 803(6), and were thus inadmissible hearsay. See Rules 801(c) and 802, Federal Rules of Evidence.

We must agree that Exhibit 2 was not within the exception provided by Rule 803(6). The main point of contention is Rice's statement on the back of the form that the value of the shipment was $7,690. There was a general statement by the REA regional claims manager that it was the ordinary course of REA's business to maintain records including Government Exhibits 1 through 6 (R. I, 7). However, Rice was not a part of REA's business organization and the statement was not shown to have been made by Rice as a part of the regular practice in *his* business activity. Moreover, the exhibit was not offered merely to show the fact that a claim was made but rather to establish the value of the shipment and this point was emphasized in the Government's questioning about the exhibit. (R. I, 7–8).

In these circumstances the exhibit with the statement on value was not made in the regular course of Rice's business activity. It lacked that indicia of trustworthiness and was inadmissible hearsay under Rules 801(c) and 802, being offered to prove the truth of the matter asserted. We feel the exhibit was not within the business records exception of Rule 803(6). See Notes of Advisory Committee on Proposed Rules, Federal Rules of Evidence, 28 U.S.C.A. at 587; IV Weinstein's Evidence, 803:147–49; *United States v. Burruss,* 418 F.2d 677, 678–79 (4th Cir.).[3]

However, the Government argues that any error in the admission of Exhibit 2 was

---

**2.** Rule 803(6), dealing with the hearsay exception for "Records of regularly conducted activity" provides:

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as

used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**3.** The *Burruss* reasoning has been followed in: *United States v. Smith,* 172 U.S.App.D.C. 297, 521 F.2d 957, 962–65; *United States v. Beasley,* 513 F.2d 309, 313–14 (5th Cir.); *United States v. Wyatt,* 437 F.2d 1168, 1170 (7th Cir.); *United States v. Jacobson,* 536 F.2d 793, 794–95 (8th Cir.), cert. denied, 429 U.S. 864, 97 S.Ct. 171, 50 L.Ed.2d 144; *Colvin v. United States,* 479 F.2d 998, 999–1003 (9th Cir.); see also *United States v. Graham,* 391 F.2d 439, 447–48 (6th Cir.); cf. *Edwards v. United States,* 374 F.2d 24, 27 (10th Cir.).

harmless in any event. It points to the fact that Exhibits 6 and 7 contained the same information on Exhibit 2 which is mainly complained of—the stated value of $7,690 as the price for the 10-ounce and 25-ounce bars shipped to Rice. The Government says that Exhibits 6 and 7 were properly admitted while defendant argues they too were inadmissible hearsay.

█ Exhibit 7 is our main concern. It was identified first by Mr. Chilton, an accountant at Constitution Mint. Before the company ceased operations, Mr. Chilton produced the documents at a preliminary hearing. He testified at the trial that under subpoena he had brought Exhibit 7—an orange expense ticket and the purchase order form prepared by one of the office secretaries. (R. I, 13, 20–21). He said he was custodian of these records while he worked at Constitution Mint and had maintained custody of them until trial. And he testified that the documents were maintained in the ordinary course of the business of Constitution Mint, and that it was the ordinary course of business at the company to maintain such records. (Id. at 13–14).

Exhibit 7 consisted of both an "REA Air Express" ticket on the shipment of silver to Nyssa, Oregon, to Mr. Allstead, the sales representative designated as "consignee," and the purchase order form. The order form contained statements about an order for one hundred 10-ounce bars at a price of "387" for a total amount of $3,870 and forty 25-ounce bars at a price of "382" for a total

amount of $3,820. Mr. Chilton further testified that Mr. Ray Kidman's initials were on the document which carried a notation "part. ship. R. K. 7/25/73."

Mr. Kidman also testified. He said that he had been shipping manager for Constitution Mint; that he recognized the purchase order form (Exhibit 7); that he had put his initials on it; and that he personally checked the 10 and 25-ounce bars as being shipped, which he oversaw (R. I, 38–39).[4] Mr. Kidman admitted he did not have any independent recollection of these points covered by his testimony and was relying entirely on his signature on Exhibit 7. (Id. at 40).

In addition, the sales representative who prepared the purchase order form testified. Mr. Allstead said that he recognized Exhibit 7, that he had prepared the original of which the exhibit was a copy,[5] that Mr. Rice ordered the silver through him, and that Rice paid $7,690 for the order of silver. Allstead said that the specific order was stolen but that he delivered the silver as ordered to Rice in August, 1973.

After hearing objections out of the hearing of the jury the trial court admitted Exhibit 7. The defendant claims error, arguing that the exhibit was hearsay, that it did not come within any exception in Rule 803(6) or Rule 805, that the record shows lack of trustworthiness of Exhibit 7, and that Kidman admitted he did not personally count the silver bars.[6]

4. Kidman testified at trial that the gross weight of the shipment, as reflected in the shipping document contained in Government Exhibit # 7, was 142 avoirdupois pounds (R. I, 41–42). Young testified at the preliminary hearing that Plum said "there was only 135 pounds . . ." of silver R. II, 203), not specifying avoirdupois or troy weight (this statement being admitted at trial). The weight and value of the silver, however, were measured on the basis of troy ounces throughout most of the evidence.

According to Webster's Third New International Dictionary (1961) at p. 1399, one avoirdupois pound equals 453 grams and one avoirdupois ounce (16 to the pound) equals 28.349 grams; one troy pound equals 375 grams and one troy ounce (12 to the pound) equals 31.103 grams. Thus, the 142 avoirdupois pound shipment weighed 64, 326 grams or approximately

2069.161 troy ounces. When allowance is made for the weight of the shipping cartons, which was not proven, this weight is not far from that of the 2000 troy ounces of silver shown on Exhibit 7 in 25-ounce and 10-ounce bars.

5. This conflicts with the statement of Mr. Chilton that a secretary prepared the purchase order, but the direct testimony by Mr. Allstead was clear and positive that he prepared the purchase order. (R. I, 132).

6. Defendant points to part of the record as showing that Kidman admitted he had not counted the silver bars, as he had earlier testified. Defendant says this shows the untrustworthiness of Government Exhibit 7 and the statement thereon about the partial shipment

We see no error in the ruling. The testimony of Mr. Chilton was sufficient that the purchase order was kept in the ordinary course of business of Constitution Mint and that it was in the company's ordinary course of business to maintain such a record. The exhibit contained data furnished at or near the time by persons with knowledge, and lack of trustworthiness was not shown. And Kidman testified about making the notation on the partial shipment, which he oversaw. We are satisfied that the requirements of Rule 803(6) were met and that untrustworthiness of the exhibit was not established.

■ We feel that our conclusion sustaining the admission of Exhibit 7 disposes of the objections concerning Exhibits 2 and 6. We have earlier agreed with the defendant that Exhibit 2 (the loss claim form) was inadmissible. Likewise we agree that Exhibit 6—an REA copy of the purchase order of Rice to Constitution Mint—did not come within the business records exception.[7] Nevertheless, Exhibit 7 contained the essentials and showed the price for the silver and the partial shipment, the latter point being supported by Kidman's testimony. Therefore, we are convinced that the error in admission of Exhibits 2 and 6 did not influence the jury or had but very slight effect

so that the verdict and judgment should stand. See *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557.

## II

*The preliminary hearing transcript*

Further defendant Plum argues that there was prejudicial error in evidentiary rulings and in the jury instructions relating to the use of prior statements of witnesses.

■ First, complaint is made that defendant's effort to attack the trustworthiness of the Government's exhibits seeking to show the bulk and value of the silver was rebuffed by an early ruling at trial that the preliminary hearing transcript containing Rick Young's testimony could only be used for impeachment. (See R. I, 17). Defendant relies on Rule 801(d)(1)(A).[8] We see no error in the ruling at this point since the transcript dealt with the amount of silver *stolen* and delivered to Plum, and did not essentially challenge the exhibits dealing with the price and the amount of silver *shipped.* Moreover, at this stage of the trial Rick Young had not testified and there was no basis for saying that the preliminary hearing transcript was inconsistent with his testimony.

---

having been made. The portion of the transcript in question reads as follows (R. I, 40):

\* \* \* \* \* \*

Q You don't know whether you actually packed these boxes; is that correct?
A That's correct.
Q You don't know whether you actually looked in and counted those silver bars; do you?
MR. SNOW: This wasn't gone into on direct, your Honor.

\* \* \* \* \* \*

THE WITNESS: No. I would have personally counted these bars.
Q BY MR. BOWN: Prior to their being sealed?
A Prior to their being sealed.

\* \* \* \* \* \*

Defendant argues that the unequivocal "No" in the penultimate response belies the subsequent assertion and shows lack of personal knowledge which Rule 803(6) requires. The Government says that the statement shows personal knowledge, particularly taken with Kidman's earlier statement that his initials

were there because he personally checked the items. (R. I, 38). We feel that there was an adequate basis for the court's ruling that the exhibit came within the exception.

7. Exhibit 6 was a photocopy of Exhibit 7 in the possession of REA and was not shown to qualify as a business record maintained by REA under the conditions prescribed by Rule 803(6). It was simply a copy of the purchase order to Constitution Mint from Rice which was sent to REA by Constitution Mint. (R. I, 6).

8. Rule 801(d)(1)(A) provides:
(d) Statements which are not hearsay. A statement is not hearsay if—
(1) Prior statement by witness. The declarant testified at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, . . .

■ Second, Plum claims error in the way the trial court ruled that the record of the preliminary hearing could be used. The magistrate's belt containing the recording of the hearing was available. Defense counsel arranged for a transcription to be made later by a court reporter of the preliminary hearing, although no reporter took down or attended the proceeding. During Rick Young's testimony the court ruled that if counsel asked Young whether he had made a certain statement and it was denied by Young, then if counsel could locate a portion of the tape itself which proved the statement was made, the court would let the jury hear it. (R. I, 86). While use of a transcript would have been easier for counsel, we find no abuse of discretion or error in the procedure chosen by the court.

■ Third, defendant's main argument about the handling of the preliminary hearing transcript is that while at one point the court let the portions read to the jury in for all purposes, in the final charge to the jury the court said that prior inconsistent statements were admissible only to impeach the credibility of a witness and not to establish the truth of the statements made. (See R. II, 203; R. III, 328).

■ We must agree with defendant that there were inconsistencies in Young's testimony at trial and in the portion of the preliminary hearing transcript which the parties agreed to have read to the jury. And the defendant is right in saying that in these circumstances such prior inconsistent statements are now admissible under Rule 801(d)(1)(A) as substantive evidence, and not merely for purposes of impeachment. *United States v. Castro-Ayon,* 537 F.2d 1055, 1056–58 (9th Cir.); see Notes of Advisory Committee on Proposed Rules, Federal Rules of Evidence, 28 U.S.C.A. at 529.

We feel nevertheless that defendant has not shown grounds for reversal on this point. In the first place, it is not clear that the preliminary hearing transcript was limited to use for impeachment by the court's statements when the transcript came in and in the final charge.[9] But in any event we are not convinced that there was any real prejudice to the defendant. The actual benefit which the defendant stood to gain from the portions of the testimony of Rick Young in the preliminary hearing transcript which were read to the jury (see R. II, 193–203), was to damage the credibility of Young, the key Government witness.[10]

**9.** Immediately after the agreed on portions of the transcript were read to the jury the trial judge stated, in the jury's presence, that he was reversing himself and letting these portions of the transcript in "for all purposes." (R. II, 203). In his final charge to the jury the court did, in general instructions dealing with consideration of various types of evidence, state that "earlier contradictory statements are admissible only to impeach the credibility of a witness and not to establish the truth of these statements." (R. III, 328).

Timely objection was made that this part of the instructions was inconsistent with the court's prior ruling that the part of the preliminary hearing transcript read to the jury was admitted for all purposes. The court replied that after hearing that part of the transcript read, he felt 90% of it was not inconsistent but was "affirmative statements" and overruled the objection to the instruction.

We are not sure of the trial court's reasoning and must agree it would have been desirable to have clarified the status of the preliminary hearing transcript to the jury. However, the defense also introduced other prior statements of Young through other witnesses, attempting to impeach Young. The court's general charge

on prior inconsistent statements was applicable to them. Thus the jury may have felt that the restriction on use of prior inconsistent statements to impeachment did not apply to the preliminary hearing transcript.

**10.** In the portion of the preliminary hearing transcript read before the jury, Young did make statements in conflict with his trial testimony. In the preliminary hearing transcript Young said that he counted the silver in the motel just after they got it and there were about 48 or 50 of the 25-ounce bars and about 22 or 23 of the "little ones." (R. II, 197–99). (The Government's proof showed that forty 25-ounce bars and one hundred 10-ounce bars were shipped). At trial, Young said he had been confused when he testified at the preliminary hearing on the number of bars and that this was "[m]ore so a guess" and that he did not know exactly how many bars were in the shipment. (R. I, 73).

We cannot see that use of the transcript of Young's preliminary hearing testimony as substantive proof would have been of real value. On the basis of forty-eight 25-ounce bars and twenty-two 10-ounce bars there would be 1,420

Such impeachment was clearly allowed by the court's instructions, but apparently was not convincing to the jury.

In sum we are not persuaded that there was any reversible error in the trial court's procedure in dealing with the preliminary hearing transcript.

### III

#### *The motion for a new trial*

Lastly defendant claims error in the denial of his motion for a new trial. The motion was based on allegedly newly discovered evidence as stated in affidavits of Don W. Pasborg and Shanna Larsen.

Pasborg was the witness who had earlier indicated he would assert his Fifth Amendment rights at trial and was not allowed to take the stand for this purpose. The subsequent affidavit of Pasborg sought to challenge Rick Young's testimony that he sold all but a few bars of the stolen silver to defendant. The affidavit stated that Pasborg knew Young; that Young approached him during the first week of August, 1973; that Pasborg bought 200 ounces of silver from Young in 25-ounce and 10-ounce bars; that Young did not tell him it was stolen; and that Pasborg never returned any of the silver to Young or delivered any of it to defendant Plum.

Defendant argues that since this testimony was unavailable earlier, it was not available as evidence and at the time of the motion did qualify as newly discovered evidence; that the record shows diligence by defendant who had Pasborg under subpoena at trial and made every effort to obtain his testimony; that the evidence from Pasborg was not merely impeaching but was close enough to showing that another party committed the crime (receiving stolen property) to demand a new trial; that the testimony was material on the crucial issues of the amount of silver received by defendant and also might well have affected the finding whether defendant knew the silver was stolen; and that in these circumstances, the evidence would likely produce an acquittal.

■ A motion for a new trial under Rule 33 on the ground of newly discovered evidence must be supported by a showing that the evidence is more than impeaching or cumulative, that it is material to the issues, and that it would probably produce an acquittal; and a new trial is not warranted by evidence which, with reasonable diligence, could have been discovered and produced at trial. *United States v. Allen,* 554 F.2d 398, 403 (10th Cir.), cert. pending; *United States v. Leyba,* 504 F.2d 441, 442–43 (10th Cir.), cert. denied, 420 U.S. 934, 95 S.Ct. 1139, 43 L.Ed.2d 408. The motion is not regarded with favor and is granted only with great caution, being addressed to the sound discretion of the trial court. *United States v. Perea,* 458 F.2d 535, 536 (10th Cir.).

■ Here the trial court considered the affidavit and also heard the testimony of Pasborg. The court strongly indicated disbelief of Pasborg's testimony, pointing to circumstances and conduct making it incredible. As to the Larsen affidavit, the trial court pointed out that her testimony showed that she had talked to defense counsel before the trial so that her testimony could not possibly be newly discovered evidence. We cannot say there was an abuse of discretion in the denial of the motion.[11]

---

troy ounces as the silver obtained by Young—a quantity which would still be large enough to satisfy the statutory requirement on value if Young's testimony was to be used affirmatively since Young also testified at trial that all but three of the bars they took went to Plum, one additional bar being left at the REA building in Boise. (R. I, 102–03; R. II, 217–18). Moreover reliance on Young's preliminary hearing testimony would seem to throw doubt on Plum's own testimony at trial that he got only twenty-nine 25-ounce bars and twenty-one or twenty-

two 10-ounce bars from Young (R. I, 182), since in the transcript Young said Plum told him "there was only 135 pounds" of silver (R. II, 203), which would be considerably more silver than Plum testified he got and again more than enough for the statutory amount.

11. During the pendency of this appeal a renewed motion for a new trial was filed in the district court in March, 1976, on the ground of newly discovered evidence supported by further affidavits and other material. Defendant-appellant Plum also moved this court to re-

None of the arguments we have covered demonstrates grounds for reversal and the remaining contentions call for no further discussion. Accordingly the judgment is

AFFIRMED.

mand the case pursuant to Rule 33, Federal Rules of Criminal Procedure, in order that the district court could have a hearing on this renewed motion, and this court denied the motion for remand. Thereafter, we are advised by defendant-appellant's brief, the district court denied the renewed motion for a new trial for lack of jurisdiction.

We have not, of course, considered the merits of the new matters raised by the renewed motion for a new trial and express no view on them. Our affirmance of the judgment and of the ruling denying the earlier motion for a new trial is without prejudice to consideration of the renewed motion for a new trial and the matters submitted in support thereof.