Troy V. MEADERS, Appellant,

v.

UNITED STATES, Appellee.

No. 84–822.

District of Columbia Court of Appeals.

Argued Nov. 13, 1985.
Decided Dec. 30, 1986.

James T. Wright, Washington, D.C., for appellant.

T. Mark Flanagan, Jr., Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., were on brief, for appellee. Christopher A. Myers, Asst. U.S. Atty., Washington, D.C., at the time the record was filed, also entered an appearance for appellee.

Before PRYOR, Chief Judge, TERRY, Associate Judge, and GALLAGHER, Senior Judge.

TERRY, Associate Judge:

Appellant appeals from his conviction of rape, in violation of D.C. Code § 22–2801 (1981). On appeal he contends that the trial court erred in refusing to admit into evidence portions of a written statement allegedly made by the victim to a defense investigator which contained comments about the victim's prior sexual relations with men; in prohibiting cross-examination of the victim about her prior sexual conduct with other men; and in refusing to admit a medical examination form describing the physical condition of the victim shortly after the rape. We reject all of appellant's arguments and affirm his conviction.

**I**

In May 1983 Mary Smith (not her real name) returned to her childhood home on Madison Street, N.W., to visit her aunt for a few days and to celebrate her nineteenth birthday. On the evening of May 17, the day after her birthday, her aunt sent her on an errand to a nearby store at Colorado Avenue and Kennedy Street. As she walked in that direction, Smith saw appellant standing on the corner in front of the store. She recognized him at once, for she had known him since childhood. They had lived only a few blocks apart, had attended the same schools, and had often played together. She had not seen him, however, since she moved away from the neighborhood a few months earlier, so she stopped to chat. After a brief conversation, the two of them agreed to smoke some marijuana together. They went to appellant's house a block away, at Colorado Avenue and Longfellow Street, where they sat on the porch, smoked one joint, and talked about old times. Smith denied that any discussion of sex occurred at this point. While they were there, appellant's father came outside and spoke with both of them.

Smith then walked back to her aunt's home to get a warmer jacket before proceeding downtown to a bar. Appellant accompanied her back to the house, riding alongside her on a bicycle. She went inside to get the jacket, and when she came out, appellant was still there. The two of them walked to the intersection of 14th and Longfellow Streets, where appellant left her and rode east on Longfellow Street on his bicycle. Smith continued down 14th Street, intending to walk until she could catch a bus.

After walking for about six blocks, Smith encountered appellant again in front of a building known in the neighborhood as "the mansion." He rode up on his bicycle and placed his arm around her, saying that he wanted a kiss. She told him she was not interested because she "like[d] the same thing he like[d]," meaning women. At that appellant became angry. He grabbed Smith and pushed her behind some bushes bordering the grounds of the mansion. Then he threw her to the ground, fell on top of her, and began to pull her clothes off. She fought back at first, but stopped when appellant threatened to kill her and punched her several times. Appellant pulled Smith's underpants and jeans down to her ankles, totally removing both garments from one leg. He inserted his penis into her vagina, saying that he was "going to bring the gayness out of [her], [that she]

shouldn't be this way," and calling her a "gay bitch" and a lesbian. Smith started squirming to get closer to the sidewalk in the hope that someone might see her, but evidently no one did. After appellant completed the sex act, he began to choke her with his hands. She responded by screaming and struggling, trying to stick her fingers into his eyes. Finally she broke away and ran out into 14th Street, shouting for help and yelling that she had been raped. Her jeans were still down at her ankles. Several cars drove past without stopping, but soon a taxicab stopped and picked her up.[1]

The cab driver took Smith to her aunt's home on Madison Street. During the assault, Smith's house keys had fallen from her pocket, so she had to bang on the door to get in. As soon as her aunt let her inside, Smith fell to the floor, screaming that she had been raped. Another relative who lived in the house testified that Smith's jeans were "partly on and partly off" and that she was wearing only one sneaker. Her aunt immediately called the police.

Metropolitan Police Officers Mark Gilkey and Monroe Reid arrived within minutes. Officer Gilkey testified that even before he went inside the house, he "could hear a person that was crying and emotional—terribly emotional state of mind." Once inside, he found Smith lying on the living room floor, partially undressed and crying, with "a couple of bruises underneath the eyes." Smith told the officers that a person she had gone to school with, Troy Meaders, had raped her and that Meaders lived on Longfellow Street. She said that he had been wearing a brown cap, a black leather jacket, and blue jeans. After some detectives from the Sex Squad arrived, Officers Gilkey and Reid went to the scene of the crime, where they and other officers found a cap that matched Smith's description, a sneaker, some keys, some pocket

change (which Smith said she had lost), and some pieces of paper bearing the name Troy Meaders and the address 1325 Longfellow Street, Northwest. The police also found a pair of woman's underpants lying in the middle of 14th Street. At trial Smith identified the keys, the sneaker, and the underpants as hers.

Officers Gilkey and Reid drove to Meaders' home at 1325 Longfellow Street. After being admitted by Meaders' father, they found appellant asleep in his bed. The officers placed him under arrest and seized a black leather jacket and a pair of blue jeans, which were in plain view in the bedroom. They took appellant to the crime scene, where Smith, who had been brought there by other officers, identified him as her assailant. Smith was then taken to a hospital for an examination, while appellant was taken to police headquarters, where sample pubic and head hairs were taken from him. Detective Michael Vaccaro testified that while this was being done, he noticed scratch marks on appellant's side and forehead.

On direct examination Smith testified that she had no present romantic interest in men, that her sexual preference was for women, and that on May 17, 1983, she was not romantically involved with any men. She stated that she and a woman were living together at an address in Southeast Washington and that they were lovers. She also said that appellant knew that she was gay and that she made no attempt to hide her preference for women from people in her neighborhood. She acknowledged that she had had a romantic interest in men in grade school and junior high school.

Appellant's defense was consent. He testified that when he met Smith on May 17, the two of them talked briefly about old times and then agreed to go to his house to "get high." Appellant said that he also suggested to Smith, "Maybe we can get

---

1. Two witnesses who lived nearby testified that they heard a woman screaming. When they went outside to see what was the matter, they saw Smith in the street, yelling and flagging down cars. They also saw a man in the bushes near the mansion who got on a bicycle and rode away, but they could not identify him.

into something," meaning sex. He admitted that Smith did not specifically reply to this comment, but he believed that she understood his meaning and that, by accompanying him to his house, she indicated her willingness to engage in sex.

When they arrived at appellant's house, he went inside to get some PCP and marijuana while Smith waited on the porch. Shortly after appellant returned, his father, who thought Smith "was a guy," came outside. Appellant and Smith then left, since they could not go into the house because his father was home. She said she wanted him to accompany her downtown, so they walked over to 14th Street and headed south.

During their three-block walk, appellant testified, the two of them smoked three joints containing PCP and marijuana. Smith then remarked that "she was hot for a man" and that "she wanted to be pleased." When he asked what she wanted to do about it, she replied, "Let's go behind [those] bushes." They walked onto the grounds of the mansion and proceeded to the darkest spot. Smith lay down on the ground and dropped her pants and underwear to her ankles. The two of them attempted intercourse, but appellant could not penetrate her fully. After five minutes, he said that he was "sore" from his efforts and that it "won't work." He got up and put on his pants, but Smith protested that "she wanted to get pleased somehow." She became upset and said he "didn't know how to please a woman." When he then refused to accompany her downtown, she stood up, still partially undressed, and started calling him names. He grabbed her and tried to calm her down, but she broke free and ran through the bushes onto the street, shouting for help. She then pulled up her pants and started to flag down passing cars, and

when a car finally stopped, she jumped inside. Appellant remained hidden behind the bushes so that he would not appear to be "suspicious of anything." Then, after looking in vain for his cap, which he had lost, he got on his bicycle and rode back up 14th Street. He went first to Smith's house to see if she had gotten home safely. Seeing the lights on, he concluded that she had, so he went home.

On cross-examination, appellant admitted that he knew Smith was gay and that since she had left school this fact was "public knowledge." He also said that on May 17 Smith's dress and haircut made her appear to be a man. On redirect appellant said he had engaged in intercourse with Smith on three or four occasions before that night. When asked if he knew she was "going with other men" even though she was gay, he responded, "Yeah."[2] On recross-examination, appellant stated that his prior sexual encounters with Smith had taken place five or six years earlier, when they were in school together. All of them had occurred at his house except one, which had happened at an "orgy off Madison Street."

## II

Appellant contends that the trial court committed error in limiting the scope of his counsel's cross-examination of Smith about her prior sexual activity with other men because such evidence would have "brought directly in issue her credibility." Appellant's point is not entirely clear. He may be arguing that the court erred in ruling that Smith could not be questioned about certain statements she gave to a defense investigator, or he may be suggesting that the trial court's ruling precluded all questions regarding Smith's prior sexual relations with any other men, not just questions relating to her comments to the defense investigator. Under either inter-

2. At this point the prosecutor objected to the question and answer concerning "other men," and the court sustained the objection. At a bench conference which followed, defense counsel asserted that his question was "not designed to show any unchastity, but to show that she was bisexual." The court responded that appellant's testimony that he had previously had sex with Smith established that she was bisexual, and that therefore the question about associations with other men was "out."

pretation, the trial court's ruling was proper.

At the beginning of his cross-examination of Smith, defense counsel told the court that he wanted to ask her about a statement she allegedly made to Sherman Hogue, a defense investigator. Counsel proffered that he wanted "to use as much of [the statement] that has to do with her testimony here today, excluding any reference to any past chastity or unchastity on her part, or any other alleged offenses that she may have committed." In particular, he wanted to ask her about certain parts of the statement in which she allegedly said that she "used to be a freak."[3] Counsel argued that this was relevant because Smith had testified that "she had always been gay and not desiring men."[4] The court ruled that counsel could ask the witness if she used to be a freak and what the term meant. However, because the prosecutor questioned the authenticity of the statement (Smith had denied making it), the court ruled that defense counsel could not cross-examine Smith about it unless he proved first that it was in fact her statement. Consequently, defense counsel did not ask Smith about the statement at that time.

Later, during the defense case, defense counsel advised the court that he was ready to call Hogue as a witness to testify that Smith had indeed given a statement. The prosecutor objected, arguing that before Hogue could take the stand, defense counsel had to confront Smith with the statement in the jury's presence. The court agreed and directed defense counsel to recall Smith if he wished to have Hogue testify.

Defense counsel then called Smith as his own witness and showed her the statement she had allegedly given to Hogue. Smith said that although she had signed a statement, the signature on the document shown to her in court was not hers; in fact, her name as it appeared in the signature was not even spelled correctly. Before any further questions could be asked, the prosecutor requested the court at a bench conference to direct defense counsel not to ask Smith about the comments in the statement about prior sexual conduct with other persons or prior drug usage. The court told defense counsel to confine his questioning to "this case." Counsel asked Smith several more questions, but made no reference to the written statement. The prosecutor then showed her the statement again and asked, "Is this the statement that you gave to Mr. Hogue?" She replied, "I gave him a statement, but that is not it, that is not the one."

 The next witness was Sherman Hogue, who testified that the document which had been shown to Smith moments earlier was in fact the statement she had signed. Defense counsel then sought to move the statement into evidence in its entirety, arguing that the comments about prior sexual contact with other men were admissible because "the government has made a central issue of the fact that the complaining witness wanted nothing but [women]," and that such comments were material to Smith's credibility on the central issue of whether she desired only women and not men. The court pointed out that the jury had already heard testimony that Smith had engaged in sex with appellant—a man—before May 17, 1983,[5] and ruled that portions of the statement concerning her

---

3. The record indicates that a freak is "someone who likes to engage in all manner of sex acts."

4. Counsel's recollection of the testimony was not correct; Smith never said that she had *always* preferred women.

5. Appellant had testified that he and Smith had previously engaged in sex on three or four occasions. This evidence was properly before the

jury. In *McLean v. United States,* 377 A.2d 74 (D.C.1977), this court held that "evidence of specific acts of sexual intercourse *with the defendant himself* should be admitted ... [to enable the defendant] to rebut the government's evidence that the prosecutrix did not consent to sexual intercourse on the particular occasion." *Id.* at 78 n. 5 (citations omitted; emphasis added).

prior sexual contact with other men would not be admitted.

 The extent of cross-examination on an appropriate subject of inquiry is a matter within the sound discretion of the trial court. *Mitchell v. United States,* 408 A.2d 1213, 1214 (D.C.1979); *see Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). The court "may always limit cross-examination 'to preclude repetitive and unduly harassing interrogation,' ... to prevent unnecessary degradation or humiliation of witnesses ... or to prevent inquiry into matters having little relevance or probative value to the issues raised at trial." *Springer v. United States,* 388 A.2d 846, 854–855 (D.C.1978) (citations omitted); *accord, e.g., Ramirez v. United States,* 499 A.2d 451, 454 (D.C. 1985). The trial court also has considerable discretion to limit cross-examination about matters which are beyond the scope of a witness' direct testimony. *See Smith v. United States,* 330 A.2d 519, 520–521 (D.C. 1974); *United States v. Stamp,* 147 U.S. App.D.C. 340, 354, 458 F.2d 759, 773 (1971), *cert. denied,* 409 U.S. 842, 93 S.Ct. 104, 34 L.Ed.2d 81 (1972). Although restrictions on cross-examination must be imposed "with the utmost caution and solicitude for the defendant's Sixth Amendment rights," *United States v. Houghton,* 554 F.2d 1219, 1225 (1st Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977), we will reverse a decision to limit the scope or extent of cross-examination only when the appellant convinces us that there has been an abuse of trial court discretion. *See Springer v. United States, supra,* 388 A.2d at 855. We find no such abuse in this case, because we hold that the matter about which defense counsel sought to cross-examine the witness was not an appropriate subject of inquiry in the first place.

In *McLean v. United States, supra* note 5, this court held that evidence of prior sexual acts by the prosecutrix in a rape case had "no relevance whatsoever to her credibility as a witness and therefore defense counsel should be precluded from asking the prosecutrix questions concerning her past sex life." 377 A.2d at 78 (citation omitted). We also said, however, that "[t]here can be *unusual circumstances* where the defense may inquire into specific sexual acts by the prosecutrix when the probative value of the evidence is clearly demonstrated *and* is shown to outweigh its prejudicial effect." *Id.* at 78 n. 6 (emphasis in original). Appellant vigorously argues that such unusual circumstances are present in this case. We do not agree.

Appellant asserts that cross-examination of Smith about the comments in the written statement concerning her prior sexual activity with men [6] was "critical to the defense" because it directly affected her credibility. He bases this argument on the premise that Smith said on direct examination that she was gay and interested only in women. The transcript reveals, however, that Smith testified only that she was gay and had no *present* interest in men, whereas the comments in the statement concerned her *past* sexual behavior with men.[7] Thus her testimony on direct was not inconsistent with the written statement, and any inconsistency that might arguably have been developed on cross-examination would be of limited probative value. Furthermore, by the time counsel sought to

---

6. The pertinent portion of the statement was as follows:

 I used to be a freak ... and had lots of men before. I even got pregnant when I was in ninth grade at Paul Jr. High. ... I have had a whole lot of men before, but they were young. My mother caught me lots of times having sex with boys in the house, garage and all but she clamped down on me. Most people are jealous of me because I have a new car and can get anything I want.

7. The trial court did not prevent defense counsel from questioning Smith about her present romantic interest in men. Thus we have no occasion to consider whether appellant was denied his right to cross-examine the complainant about a subject raised upon direct examination. *See Smith v. United States, supra,* 330 A.2d at 520.

question Smith about the statement, other evidence had already been admitted showing that Smith had previously had a sexual interest in men,[8] which was one of the points counsel wanted to make by cross-examining her. We note also that counsel said only that he wanted to inquire generally about Smith's prior sexual behavior with men, not about any specific sexual acts. Finally, the government's thesis that because Smith was a lesbian, she would not have consented to intercourse with appellant was a minor aspect of the government's case. We therefore conclude that appellant did not "clearly demonstrate[ ]" the probative value of his proposed cross-examination of Smith concerning her comments in the written statement about her prior sexual relations with men. *McLean v. United States, supra* note 5, 377 A.2d at 78 n. 6.

Appellant claims nevertheless that the probative value of the proposed cross-examination clearly outweighed its prejudicial effect. He asserts that "there can be no prejudice where [the] prosecutrix affirmatively admits her lesbian lifestyle." We disagree. Prejudice results when cross-ex-

amination probes into the private life of a rape victim, regardless of her sexual orientation. *See McLean v. United States, supra* note 5, 377 A.2d at 77. The fact that a rape complainant may have engaged in promiscuous sexual activity in the past does not prove that she consented to sexual relations with the defendant; indeed, as we noted in *McLean*, it " 'may indicate the contrary.' " *Id.* (citation omitted). Thus we hold not only that the proposed cross-examination was prejudicial, but also that it was totally devoid of probative value. *McLean* is dispositive in both respects.[9]

### III

Appellant contends that the trial court erred in refusing to admit into evidence a Metropolitan Police Department Medical Examination Form (PD–124). He asserts that the report was admissible under the federal shopbook rule[10] because it was kept in the ordinary course of business by the police. We find no error.

During the presentation of appellant's case, defense counsel sought to question Detective Vaccaro about the PD–124. The prosecutor objected, arguing that even

8. Smith had admitted that she previously had a romantic interest in men, and appellant had testified that he had engaged in intercourse with her on three or four occasions when they were in school.

9. For the same reasons we find no merit in appellant's corollary argument that the trial court abused its discretion in refusing to admit into evidence the actual comments about Smith's prior sexual behavior (see note 6, *supra* ), as well as refusing to allow cross-examination about them. *McLean* is dispositive on this point as well.

It should be pointed out that the court did not prohibit all questions about Smith's prior sexual contact with other men, but only questions based on the written statement. Defense counsel never sought to ask her about any such activities other than those to which the statement referred. Not surprisingly, then, counsel did not "clearly demonstrate[ ]" the probative value of such inquiry independent of the written statement. *McLean, supra* note 5, 377 A.2d at 78 n. 6.

10. The federal shopbook rule, formerly codified at 28 U.S.C. § 1732(a) (1970), was repealed by Congress when the Federal Rules of Evidence

were enacted in 1975. It was replaced in the federal courts by Fed.R.Evid. 803(6). Since the Federal Rules of Evidence are not applicable in the Superior Court, Super.Ct.Civ.R. 43–I(a) was promulgated at the same time to govern the admission of business records. Rule 43–I(a), which is substantially identical to the former 28 U.S.C. § 1732(a), provides in part:

Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum of record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

This rule is made applicable to criminal cases by Super.Ct.Crim.R. 57(a).

though Vaccaro had co-signed the form, a doctor had actually prepared it, and Vaccaro had no knowledge of its contents. The court ruled that if the detective did not prepare the document, counsel could not question him about it. Further testimony established that Vaccaro had not prepared the form.

After the last defense witness had testified, defense counsel asked leave of court to recall Vaccaro, saying that he was unable to locate the doctor who had prepared the PD–124. He argued that the form was admissible under the federal shopbook rule because it was kept as a police record in the ordinary course of business. The court refused to admit it on that theory because the police did not have anything to do with its preparation, and denied permission to recall Vaccaro.

■ Both parties agree that the form was hearsay. Appellant contends, however, that it falls within the shopbook rule —or, more precisely, within the business records exception to the hearsay rule embodied in Super.Ct.Civ.R. 43–I(a). We hold that appellant has failed to carry his burden of demonstrating that the form is a business record.

■ The party seeking admission of a document under the business records exception must demonstrate, through a competent witness, (1) that the record was made in the regular course of business, (2) that it was the regular course of business to make such a record, and (3) that the record was made at, or within a reasonable time after, the act, transaction, occurrence, or event which it reports. *In re D.M.C.,* 503 A.2d 1280, 1282 (D.C.1986); *Smith v. United States,* 337 A.2d 219, 222 (D.C. 1975); *see Martini Hairdressers, Inc. v. Potomac Beauty Supply Co.,* 203 A.2d 200, 201 (D.C.1964); *Gass v. United States,* 135 U.S.App.D.C. 11, 15–16, 416 F.2d 767,

771–772 (1969). "In addition, the party must also prove that the maker of the record had personal knowledge of the facts set forth in that record or, if not, that the facts were communicated to the maker, directly or indirectly, by one who was acting in the regular course of business and who had such personal knowledge." *In re D.M.C., supra,* 503 A.2d at 1282–1283 (citations omitted).

The PD–124 is unusual in that it is a police department form, but almost all the information on it is recorded by the physician examining the victim of a sexual assault. Under the business records exception, each participant in its preparation must be acting in the course of a regularly conducted business. "The reason underlying the business records exception fails if any of the participants is outside the pattern of regularity of activity." 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(6)[04], at 803–186 (1985) (footnote omitted); *see United States v. Plum,* 558 F.2d 568, 572 (10th Cir.1977); *Kehm v. Procter & Gamble Co.,* 580 F.Supp. 890, 903–904 (N.D.Iowa 1982); *Dell Publishing Co. v. Whedon,* 577 F.Supp. 1459, 1464 n. 5 (S.D.N.Y.1984); *see also United States v. Baker,* 224 U.S.App.D.C. 68, 73, 693 F.2d 183, 188 (1982). Therefore, before a PD–124 may be admitted into evidence as a business record, the party seeking its admission must establish that *both* the portion of the form filled out by the police officer *and* the portion filled out by the doctor meet the requirements of the business records exception to the hearsay rule.[11] *See United States v. Plum, supra,* 558 F.2d at 572. Appellant failed to establish that the portion of the form filled out by the doctor met those requirements.[12]

■ To make the doctor's portion of the form admissible, a knowledgeable witness had to testify about the record-keeping

---

11. Appellant does not contend that the statements on the form were admissible under any other exception to the hearsay rule.

12. We therefore need not consider whether the portion of the form filled out by the police officer fell within the business records exception, or whether part of the form may be admissible if a proper foundation is laid for that part.

practices of the doctor's organization—the hospital. 4 J. WEINSTEIN & M. BERGER, *supra*, ¶ 803(6)[02]; *see, e.g., United States v. Phillips*, 515 F.Supp. 758, 763 (E.D.Ky. 1981). The person who actually writes the information on the document does not need to testify so long as other evidence establishes its trustworthiness. *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1259 (11th Cir.1983). The requisite foundation for admission of the document, however, "must be laid through the testimony of someone who is sufficiently familiar with the practices of the business involved to testify that the records were made in the regular course of business, and thus to verify their authenticity." *United States v. Leal*, 509 F.2d 122, 127 (9th Cir.1975) (citations omitted); *accord, e.g., United States v. Veytia-Bravo*, 603 F.2d 1187, 1191–1192 (5th Cir.1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980); *United States v. Jones*, 554 F.2d 251, 252 (5th Cir.), *cert. denied*, 434 U.S. 866, 98 S.Ct. 202, 54 L.Ed.2d 142 (1977). "A qualified witness must be one with knowledge of the declarant's business," *Elizarraras v. Bank of El Paso*, 631 F.2d 366, 374 n. 24 (5th Cir.1980), although the witness need not be an officer or employee of the business, so long as he or she "understands the system." 4 J. WEINSTEIN & M. BERGER, *supra*, ¶ 803(6)[02], at 803–178 (footnote omitted); *see also United States v. Phillips, supra*, 515 F.Supp. at 763.

Appellant attempted to introduce the PD–124 through the testimony of Detective Vaccaro. Vaccaro, however, could not testify (1) that the medical form was made in the hospital's regular course of business, (2) that it was the regular course of the hospital's business to fill out the form, (3) that the record was made at, or within a reasonable time after, the medical examination of the victim, or (4) that the person who filled it out had personal knowledge of the facts stated in the form or, if not, that the facts were communicated to that person, directly or indirectly, by someone who was acting in the regular course of business and who had such personal knowl-

edge. *See In re D.M.C., supra*, 503 A.2d at 1282–1283. The record makes clear that Vaccaro simply was not sufficiently familiar with the practices of the hospital to give such testimony. *United States v. Leal, supra*, 509 F.2d at 127. Without it, the form was not admissible as a business record. *Id.; United States v. Plum, supra*, 558 F.2d at 572; *see also United States v. Ordonez*, 737 F.2d 793, 805 (9th Cir.1984). Thus we hold that the trial court did not err in refusing to admit the PD–124 into evidence.

*Affirmed.*

GALLAGHER, Senior Judge, concurring in part and dissenting in part:

The majority opinion comes to the conclusion that "the proposed cross-examination was prejudicial, [and] also ... it was totally devoid of probative value." Yet, appellant's only "mistake" was that he sought to cross-examine the government witness on a subject testified to by her on direct examination. This is because, says the majority, it was precluded by our decision in *McLean v. United States*, 377 A.2d 74 (D.C.1977).

But *McLean* simply held that the trial judge there had properly excluded testimony that the complaining witness had engaged in sexual relations with others on prior occasions and, also, excluded testimony that she had a reputation for unchastity. This court stated that the prejudicial effect outweighed its probative value. *Id.* at 79. The court went on to say that the credibility of the complaining witness should revolve around evidence relating to whether the complainant consented to the act and not on evidence of her prior sexual relations. *Id.*

This is all well and good, but it is not to say that *McLean* prevails over the right to cross-examine a witness on what she has volunteered on direct-examination about her sexual life. It is almost too obvious to mention that—where consent is the issue (as here)—if the complaining witness offers on direct examination, among other things,

that she is a lesbian, this may seriously impair a defense of consent to the charged rape.[1]

Furthermore, in a criminal case one should be given adequate scope on cross-examination to avail oneself of the elementary right of confrontation. Naturally, the trial judge is vested with discretion to limit reasonably the cross-examination. But this is not to say that the trial court should be supported where, as here, it is begrudging about the right to cross-examine. It is the most fundamental right a criminal defendant has—the right to confront the accuser. Any doubt should be resolved in favor of allowance of the cross-examination. It is no place to be hyper-technical.

While I would find error, I believe that on this particular record—where there was considerable disinterested testimony on the rape—the constitutional error does not require reversal here, under the harmless beyond a reasonable doubt test. *See Delaware v. Van Arsdall,* —— U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).[2]

1. The majority opinion states:
 *On direct examination Smith testified* that she had no present romantic interest in men, that her sexual preference was for women, and that on May 17, 1983, she was not involved romantically with any men. She stated that she and a woman were living together at an address in Southeast Washington and that they were lovers. She also said that appellant knew she was gay and that she made no attempt to hide her preference for women from people in her neighborhood. She acknowledged that she had had a romantic interest in men in grade school and junior high school. (Emphasis added.)
 While the majority in its discussion draws certain refinements, *e.g.,* n. 2 and n. 5 of majori-

ty opinion, the fact remains that the majority's recitation of the record situation on its face establishes a clear right to cross-examine on the subject matter.

2. I also disagree with the majority on the exclusion of the proffered Metropolitan Police Department Medical Examination Form (PD–124). It is essential only that the offering witness (the officer) be able to identify the record as authentic and made and preserved in the regular course of police business. It seems unwarranted to exclude this police form containing the results of the complainant's medical examination after the incident.